No. 127,778

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MCKAINE TYSON FARR,
*Appellant*.

SYLLABUS BY THE COURT

1.

There is nothing in the plain language of K.S.A. 21-5430(b) that limits the criminal liability for a death resulting from using a controlled substance to the final distributor of the controlled substance. Instead, liability extends to anyone who had joint control of the controlled substance.

2.

Distribution of fentanyl is a crime under K.S.A. 21-5705(a)(1) and by extension distribution of fentanyl causing death is a crime under K.S.A. 21-5430(b).

Appeal from Pottawatomie District Court; JEFFREY R. ELDER, judge. Submitted without oral argument. Opinion filed August 14, 2026. Conviction affirmed, sentence vacated, and case remanded with directions.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Ryan J. Ott*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

1

Before WARNER, C.J., ARNOLD-BURGER, J., and LAURA JOHNSON-MCNISH, District Judge, assigned.

ARNOLD-BURGER, J.: A jury convicted McKaine Tyson Farr of one count of aiding and abetting in the distribution of a controlled substance causing death. He drove Noah Baker to a drug deal during which Baker sold fentanyl pills to Shawn Samuelson and Thomas Deloach. Deloach died from an overdose that evening after using those pills. At sentencing, the court imposed a 72-month prison sentence. Farr appeals his conviction and sentence. After a thorough review, we affirm Farr's conviction but vacate his sentence and remand for a determination of jail credit.

FACTUAL AND PROCEDURAL HISTORY

In 2023, the State charged Farr with one count of distributing a controlled substance causing death, a felony.

The State prosecuted the charge under an aiding and abetting theory, presenting evidence at trial showing that Farr drove his friend Baker to a Hy-Vee in Manhattan, where a drug deal occurred. The deal had been arranged between Baker and Samuelson. Before this meeting, Samuelson had discussed obtaining the pills with a group of individuals, including Deloach. Deloach contributed money toward the eventual purchase and stood outside Farr's truck when the transfer occurred.

Samuelson testified that when Baker was on the way to the gas station, he asked Baker to separate the fentanyl into two baggies so "I didn't have to do it, and I could just hand one to [Deloach]." Baker said he had already separated it before arriving. At the gas station, Samuelson said he got into the front seat of Farr's truck and paid Baker $500 in exchange for 60 fentanyl pills contained in two baggies, with the expectation that another

2

person would deliver 40 more pills later that day. After exiting the truck, Samuelson and Deloach went into the bathroom of the gas station to divide the pills between them.

Samuelson and Deloach then went to a hotel with several others to use the drugs. When Chancellor Copenhaver later arrived at the hotel to deliver the remaining 40 pills, he and Samuelson realized that Deloach was not breathing. After administering Narcan to rouse Deloach, Copenhaver called law enforcement to report the incident. Officers arrived to discover Deloach was deceased and two pills were located next to him, which Samuelson had left so law enforcement knew what Deloach had taken. Forensic analysis of the pills confirmed they contained fentanyl. Likewise, an autopsy confirmed that Deloach's cause of death was fentanyl intoxication.

During a recorded interview with a detective in the Riley County Police Department, Farr said that he initially agreed only to drive Baker to a U.S. Cellular phone store in Manhattan to purchase a new phone. On the way to Manhattan, Baker said he would give Farr an extra $20 in gas money if they stopped at a Hy-Vee gas station. Farr denied knowing what would happen there and agreed to stop in exchange for the extra gas money.

According to Baker's girlfriend—who was in the backseat of Farr's truck when the drug transaction occurred—Farr drove them from her mom's house in Junction City to the U.S. Cellular in Manhattan, but they left shortly after because the employees said it would be a long wait. From there, they went to the Hy-Vee gas station where the exchange occurred.

The detective, however, testified at trial that he obtained GPS information through a subpoena of Farr's Snapchat account. Based on that information, Farr drove from Wamego to an address in Junction City, where Farr stayed for about an hour. From there, Farr drove to the Hy-Vee gas station and then to the U.S. Cellular. Farr then drove back

3

to Junction City to a location a few blocks away from Baker's address, and after that drove back to Manhattan near the gas station before returning to his residence in Wamego.

Baker's girlfriend witnessed the drug exchange at the gas station and Farr's active participation in it. She testified that Baker realized he did not have enough pills when they got there. Farr also had pills on him, so Baker got some from Farr while Samuelson was in the car. When Samuelson gave Baker the money, Baker gave some to Farr for what "he had put in." Samuelson handed Baker the money and Baker gave him 60 pills.

Before the case was submitted to the jury, the parties stipulated to the following:

"(1) Noah Baker intentionally Distributed Fentanyl on March 11, 2023.
"(2) Thomas Deloach's use of the fentanyl distributed by Noah Baker on March 11, 2023 resulted in his death.
"(3) Thomas Deloach's death would not have occurred but for his use of the fentanyl distributed by Noah Baker on March 11, 2023.
"(4) Thomas Deloach's death was a reasonably foreseeable consequence of his use of the fentanyl distributed by Noah Baker on March 11, 2023.
"(5) The Defendant has actual knowledge that the use of fentanyl, in small doses can result in death of the user. The defendant knows death is a reasonably foreseeable consequence of the use of fentanyl."

During deliberations, the jury asked the following question: "If the defendant finds out during but does not aid until after the transaction by driving the get away car[,] does that constitute criminal responsibility?" While there is no discussion from the parties on the record about this question, the district court answered as follows: "[T]he distribution defendant is charged with aiding concluded with the transaction between Mr. Baker and Mr. Samuelson. See instructions No. 5 and 6."

4

The jury convicted Farr. At sentencing, the district court granted Farr's request for durational departure, imposing a 72-month prison sentence that would run consecutive to an earlier case. After the court noted that the presentence investigation report showed Farr was eligible for 302 days of jail credit, the State asserted that 211 of those days were previously credited in the earlier case. The court advised that it would "leave that to counsel to sort out," but if the parties could not reach an agreement, a hearing would be held to determine the proper amount of jail credit. The district court entered a journal entry of judgment reflecting the sentence imposed but included only the sentencing date in the section for awarding jail credit.

Farr timely appeals.

ANALYSIS

*There was sufficient evidence that Farr intentionally aided in the distribution of a controlled substance causing death.*

Farr contends there was insufficient evidence to support the jury's verdict because the State failed to prove he intentionally aided the final distributor of the fentanyl in committing the crime of distribution of a controlled substance causing death. His argument is two-fold: (1) the State failed to prove that Baker distributed fentanyl to Deloach, so he could not be found guilty of aiding in the underlying crime; and (2) alternatively, the State failed to prove Farr had the specific intent to aid Samuelson in distributing fentanyl to Deloach.

When a defendant challenges the sufficiency of the evidence in a criminal case, appellate courts view the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The court will not reweigh or resolve evidentiary conflicts or pass on the

5

credibility of witnesses. *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). This court exercises unlimited review over questions of statutory interpretation. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022).

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. This court must first attempt to determine legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, this court should not speculate about the legislative intent behind that clear language and should refrain from reading something into the statute that is not readily found in its words. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022).

To convict an individual of a crime, the State must prove to the trier of fact beyond a reasonable doubt of the existence of every element of the offense. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). As Farr notes, appellate courts will often look to the jury instructions to determine the elements of the offense that the State needed to prove, especially when the instructions define the crime more narrowly than the charging document. *State v. Couch*, 317 Kan. 566, 582, 533 P.3d 630 (2023), *abrogated on other grounds by State v. Garcia-Martinez*, 318 Kan. 681, 546 P.3d 750 (2024). But the Kansas Supreme Court has departed from that approach when the elements in the jury instruction deviate from the statutory elements listed in the charging document, i.e., by setting out the elements of a different subsection of the charged offense. Then, we are to measure sufficiency of the evidence against the statutory elements of the charged crime rather than the elements of the crime as described in the jury instructions. 317 Kan. at 582 (citing *State v. Fitzgerald*, 308 Kan. 659, 423 P.3d 497 [2018]).

Here, the State charged Farr with distribution of a controlled substance causing death under K.S.A. 21-5430(b). The district court instructed the jury to consider whether

6

he "aided another in the distribution of Fentanyl" and "the death of Thomas Jackson Deloach resulted from his use of the Fentanyl distributed by another." So, if Baker is guilty of distributing fentanyl that resulted in the death of Deloach, so is Farr to the extent that he aided and abetted Baker in that crime.

"Distribution of a controlled substance causing death is distributing a controlled substance in violation of K.S.A. 21-5705, and amendments thereto, when death results from the use of such controlled substance." K.S.A. 21-5430(b). For this crime, "'distribute' has the same meaning as defined in K.S.A. 21-5701." K.S.A. 21-5430(e)(2). Therefore,

> "['d]istribute' means the actual, constructive or attempted transfer from one person to another of some item whether or not there is an agency relationship. 'Distribute' includes, but is not limited to, sale, offer for sale or any act that causes some item to be transferred from one person to another." K.S.A. 2022 Supp. 21-5701(d).

Farr asserts the plain language of this definition limits the "'distribution'" to direct transfers between two people. Based on that interpretation, he argues that only Samuelson could be guilty of the underlying crime of distribution of fentanyl causing death, summarizing the evidence as follows: "Baker distributed fentanyl to Samuelson. . . . Samuelson, without any direction from Baker or Farr, distributed fentanyl to Deloach." Because the State's theory of the case was that Farr only aided Baker, Farr argues there was insufficient evidence to establish that he aided Samuelson in the distribution of fentanyl that caused Deloach's death. In other words, Samuelson was an independent intervening party.

The State responds that Farr's argument presents a "red herring" because the only question is whether "sufficient evidence support[s] the jury's finding Farr aiding Baker in distributing fentanyl that led to Deloach's death." It argues that Farr's stipulation coupled

7

with the trial evidence demonstrate that Samuelson and Deloach jointly decided to purchase fentanyl from Baker and Baker was aware of that.

In viewing the evidence *in the light most favorable to the State*, the evidence *and* stipulations established the following:

- Baker was known to be a drug dealer.

- Baker did not have a car and did not drive.

- Farr went to school with Baker's cousin, knew Baker to be a drug dealer, and had purchased drugs from Baker before. When asked where Baker lived, he was able to recite Baker's parents' address from memory, he knew Baker lived with his girlfriend's parents and could describe where they lived. He knew Baker primarily corresponded through Snapchat and was able to provide the detective with Baker's Snapchat account.

- Baker called Farr and asked him to take him to Manhattan to get a new phone. He believed Baker contacted him because Baker knew Farr had a truck and was not usually busy.

- Baker did not deal with people he did not know. He would not have had someone sit next to him in the car that he did not know.

- Farr went to the place Baker was living where he stayed for approximately an hour consuming drugs—"Perc 30s"—with Baker and Baker's girlfriend.

- Earlier in the day, Samuelson contacted Baker to purchase pills. Baker reached an agreement over Snapchat to sell 100 Perc 30s to Samuelson for $500. Baker set the exchange spot as the Hy-Vee gas station in Manhattan.

- The pills were to be divided into two baggies—so Samuelson did not have to do it, and he could just hand one to Deloach. Deloach contributed money toward the eventual purchase.

- Farr drove Baker to the Hy-Vee in Manhattan where the exchange was to take place.

8

- Samuelson got in the front seat of the car. Baker moved to the center seat and Farr remained in the driver's seat. Baker's girlfriend was in the backseat. Deloach kept trying to come up to the car to see what was happening because of his fear that Samuelson was going to cheat him. Baker already had the pills in two baggies, as requested.

- Samuelson remained in the car for three and a half minutes.

- From the backseat, Baker's girlfriend witnessed the drug exchange. She testified that Baker realized he did not have enough pills when they got there. Farr also had pills on him, so Baker got some from Farr while Samuelson was in the car. When Samuelson gave Baker the money, Baker gave some to Farr for what "he had put in."

- Samuelson handed Baker the money and Baker gave him 60 pills. Baker then counted the money. Baker texted Samuelson after they left and told him he only gave him 60 pills and he would send someone out later with the other 40.

- Baker intentionally distributed fentanyl on March 11, 2023.

- Deloach's use of the fentanyl distributed by Baker on March 11, 2023, resulted in his death.

- Deloach's death would not have occurred but for his use of the fentanyl distributed by Baker on March 11, 2023.

- Deloach's death was a reasonably foreseeable consequence of his use of the fentanyl distributed by Baker on March 11, 2023.

- Farr had "actual knowledge that the use of fentanyl, in small doses can result in death of the user [and knew] death is a reasonably foreseeable consequence of the use of fentanyl."

In support of his argument, Farr emphasizes that "neither Farr nor Baker constructively transferred fentanyl to Deloach," because "constructive transfer" requires

"[a] delivery of an item—esp. a controlled substance—by someone other than the owner but at the owner's direction." Black's Law Dictionary 1809 (12th ed. 2024).

Contrary to Farr's assertions, there is nothing in the plain language of K.S.A. 21-5430(b) that limits the criminal liability for a death resulting from using a controlled substance to the "final distributor." Moreover, as the State points out, there is precedent contradicting this proposition.

In *State v. Crosby*, 312 Kan. 630, 637, 479 P.3d 167 (2021), the Kansas Supreme Court held that the State must present sufficient evidence of possession to convict a defendant of distribution of a controlled substance because "it is impossible to 'transfer' a controlled substance 'from one person to another' without having 'joint or exclusive control over' the controlled substance first. See K.S.A. 2019 Supp. 21-5701(d); K.S.A. 2019 Supp. 21-5701(q)." Although *Crosby* interpreted an earlier version of the statute, the version applicable to Farr's conviction likewise defined possession to mean "having joint or exclusive control over an item with knowledge of and intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control." K.S.A. 2022 Supp. 21-5701(q).

As the State notes, the Kansas Supreme Court applied this holding in *State v. Stuart*, 319 Kan. 633, 556 P.3d 872 (2024). In that case, the defendant was convicted of felony murder based on the underlying felony of distribution of marijuana. The trial evidence reflected that Stuart fatally shot the victim during a drug sale. During the transaction, Stuart passed money to an intermediary, who passed it to the seller, who handed the marijuana back to the intermediary. When the seller attempted to grab the marijuana back, Stuart shot the seller. On appeal, the Kansas Supreme Court held there was sufficient evidence to establish the required element of possession through joint control, but not that he intended to distribute the marijuana. 319 Kan. at 636-37; see also

10

Black's Law Dictionary 1409 (12th ed. 2024) (defining joint possession as "[p]ossession shared by two or more persons").

Although Farr filed a reply brief, he fails to challenge the applicability of these holdings to this case. See *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020) (Failure to support a point with pertinent authority or failure to show why a point is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue.).

Other states considering similar statutes have reached the same conclusion—criminal liability for a death resulting from distribution of a controlled substance is not limited to the final distributor, but to anyone who had joint control of the drug.

In *Aumuller v. State*, 944 So. 2d 1137 (Fla. Dist. Ct. App. 2006), Jason Aykroyd, Jairon Nevius, and Ryan Connaughton decided they wanted to get some heroin. Aykroyd was familiar with Michael Aumuller and had purchased drugs from him in the past. Aykroyd contacted Aumuller and they arranged to meet at a gas station to consummate the transaction. Nevius gave Aykroyd the money. Aumuller was in the passenger seat, and his friend Crouse was in the driver seat. Aykroyd exchanged the money for the drugs with Crouse. After Crouse and Aumuller drove away, Aykroyd gave the heroin to Nevius. Nevius would later die after consuming the heroin. Aumuller was charged with first-degree murder under section 782.04(1)(a)(3), Florida Statutes (2001). Like here, the State had to prove that Nevius' death resulted from the unlawful distribution of a controlled substance by [Aumuller], and the drug was the proximate cause of Nevius' death. The Florida Court of Appeal concluded that the evidence was sufficient to support Aumuller's conviction because "a person commits the offense by acting as a distributor in the drug distribution chain, and it is irrelevant that other persons are also involved in the chain." 944 So. 2d at 1142.

The distribution chain was even more attenuated in *United States v. Harden*, 893 F.3d 434 (7th Cir. 2018). Donald Harden sold heroin to Brandi Kniebes-Larsen who sold it to Kyle Peterson who sold it to Fred Schnettler, who died after injecting it. The government was required to prove beyond a reasonable doubt that (1) Harden conspired to distribute 100 grams or more of heroin; and (2) "'death or serious bodily injury result[ed] from the use of such substance.' 21 U.S.C. § 841(b)(1)(B)." 893 F.3d at 445-46. Although the focus of the case was on whether the heroin that Harden supplied was potent enough to cause Schnettler's death, Harden did not dispute that the government had established the first element of distribution. It was irrelevant that Harden was several distributors removed from Schnettler's final supplier—Peterson. 893 F.3d at 446; see also *State v. Ferguson*, 238 N.J. 78, 100-01, 207 A.3d 1253 (2019) ("A defendant can be found guilty of causing a drug-induced death even if there are intervening links in the chain between the distributor and the victim."); *State v. Maldonado*, 137 N.J. 536, 571, 645 A.2d 1165 (1994) ("The statute is intended to apply to every wrongdoer in the distribution chain.").

As applied to the facts of this case, Deloach had possession of the fentanyl through joint control once Baker passed the two baggies of fentanyl to Samuelson because Samuelson was acting as Deloach's intermediary. Although Farr attempts to frame the drug sale as involving a distribution solely between Baker and Samuelson, the evidence reflects two simultaneous distributions: one directly between Baker and Samuelson, and the other between Baker and Deloach with Samuelson acting as an intermediary. And evidence was presented through Baker's girlfriend that Farr even supplied some of the drugs that were sold to Samuelson. Given these facts, we have no trouble finding that a rational factfinder viewing the evidence in the light most favorable to the State could have found the evidence sufficient to support Farr's conviction.

Because we have found the evidence was sufficient to support his conviction, we need not address Farr's alternative argument that there was insufficient evidence that Farr had the specific intent to aid Samuelson in distributing fentanyl to Deloach.

*Distribution of a controlled substance causing death includes the distribution of fentanyl.*

The claims made in Farr's next two issues are based on the same underlying argument, which is that distribution of fentanyl causing death is not a crime. According to Farr, K.S.A. 21-5705 (statute criminalizing unlawful distribution of controlled substances) does not specifically list "fentanyl" within the types of controlled substances that are illegal to distribute in Kansas. From that premise, he makes the following claims: (1) distribution of fentanyl causing death is a "nonexistent crime" so the district court lacked subject matter jurisdiction; (2) even if distribution of fentanyl is a crime, the State failed to prove by sufficient evidence that the fentanyl distributed in this case met the applicable legal definition; and (3) the district court erroneously instructed the jury not to consider whether the fentanyl distributed in this case met the applicable legal definition. These three claims will be addressed in turn.

*The district court had subject matter jurisdiction.*

District courts acquire subject matter jurisdiction in a criminal case only if the State has charged a crime recognized by a Kansas statute. See *State v. Jordan*, 317 Kan. 628, 643, 537 P.3d 443 (2023) (citing *State v. Dunn*, 304 Kan. 773, Syl. ¶ 2, 375 P.3d 332 [2023]). Farr argues that distribution of fentanyl causing death is a "nonexistent crime," so the district court lacked subject matter jurisdiction.

Consideration of Farr's claim involves interpreting various Kansas statutes. We are guided in determining a statute's meaning by the overarching rule that the intent of the Legislature governs if that intent can be ascertained. We do that through a review of the

13

statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, this court should not speculate about the legislative intent behind that clear language and should refrain from reading something into the statute that is not readily found in its words. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). So we turn to the statute to divine its meaning.

*Distribution of fentanyl is a crime.*

Like Hansel and Gretel in the forest, we must follow several breadcrumbs to reach our conclusion that distribution of fentanyl is a crime. We begin with the charge.

The State charged Farr with distribution of a controlled substance causing death under K.S.A. 21-5430(b): "Distribution of a controlled substance causing death is distributing a controlled substance in violation of K.S.A. 21-5705 . . . when death results from the use of such controlled substance."

But what is a controlled substance? The same statute defines it as having the same meaning as it is given in K.S.A. 21-5701. K.S.A. 21-5430(e)(1).

So we must follow that breadcrumb to see how K.SA. 2022 Supp. 21-5701 defines controlled substance.

Under K.S.A. 2022 Supp. 21-5701(a), "'controlled substance' means any drug, substance or immediate precursor included in any of the schedules designated in K.S.A. 65-4105, 65-4107, 65-4109, 65-4111 and 65-4113 . . . ." K.S.A. 2022 Supp. 21-5701(a). As further explanation, the schedules referenced in this definition are part of the Kansas Uniform Controlled Substances Act, which itself defines "'[c]ontrolled substance'" identically to the above. K.S.A. 2022 Supp. 65-4101(f). Put simply, the drug schedules

14

are directly incorporated into the statute criminalizing drug distribution through this shared definition.

This leads us to the final breadcrumb. We must look to see if fentanyl is listed in any of the drug schedules. It is. Fentanyl is specifically listed as a Schedule II drug, designated an opiate and prohibited under K.S.A. 2022 Supp. 65-4107(c)(9). We have arrived home. Fentanyl is a controlled substance.

Even so, Farr asserts that K.S.A. 21-5430(b), the statute under which Farr was charged contains an additional qualifier that is the linchpin of his argument. Remember, the statute provides: "Distribution of a controlled substance causing death is distributing a controlled substance in violation of K.S.A. 21-5705." So he argues the distribution must violate K.S.A. 21-5705. We turn to that statute to see if he is right.

Farr asserts the "only relevant part" of K.S.A. 21-5705 is subsection (a)(1), which provides:

> "It shall be unlawful for any person to distribute or possess with the intent to distribute any of the following controlled substances or controlled substance analogs thereof:
> "(1)     *Opiates, opium or narcotic drugs*, or any stimulant designated in subsection (d)(1), (d)(3) or (f)(1) of K.S.A. 65-4107 . . . ." (Emphasis added.)

Because fentanyl is not a stimulant designated in subsection (d)(1) amphetamine, (d)(3) methamphetamine, or (f)(1) precursors to both amphetamine and methamphetamine, Farr contends that distributing fentanyl is only unlawful under the statute if fentanyl falls under "[o]piates, opium or narcotic drugs." In Farr's view, the omission of fentanyl from this list means it is not a narcotic drug or opiate for which distribution is criminalized by K.S.A. 21-5705(a)(1).

15

Farr is correct that, K.S.A. 21-5705 itself does not contain a definition for the terms "opiate," "opium," and "narcotic drug." Yet K.S.A. 2022 Supp. 21-5701, is the definitional section that expressly controls K.S.A. 21-5701 through K.S.A. 21-5717 and it does.

> "(l) 'Narcotic drug' means any of the following . . .
>
> (1) Opium and opiate and any salt, compound, derivative or preparation of opium or opiate;
>
> . . . .
>
> "(m) 'Opiate' means any substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having addiction-forming or addiction-sustaining liability." K.S.A. 2022 Supp. 21-5701.

See also K.S.A. 2022 Supp. 65-4101(dd), (ee) (defining terms identically).

As the parties both note, fentanyl is expressly designated as a Schedule II controlled substance under K.S.A. 2022 Supp. 65-4107(c)(9) within the category of "opiates."

Although Farr insists the Legislature only incorporated specific portions of the drug schedules into K.S.A. 21-5705, he is wrong. The statute broadly criminalizes unlawful distribution of *controlled substances*, which are statutorily defined by reference to the drug schedules. K.S.A. 2022 Supp. 21-5701(a). By designating fentanyl as a Schedule II controlled substance and describing it as an opiate, the Legislature clearly intended the specific definitions of those terms to apply.

Moreover, the Kansas Supreme Court's decision in *State v. Brown*, 321 Kan. 1, 573 P.3d 237 (2025), is instructive, if not controlling. In that case, the court held: "While the presence of THC in a substance may be relevant to a fact-finder's determination of whether a substance is marijuana, '[p]roof of the presence of THC is not required to meet

16

the statutory definition of marijuana.'" 321 Kan. at 8. To reach that conclusion, the court adopted an identical rationale as the one expressed above, stating:

> "As discussed, the State charged Brown with first-degree felony murder with distribution of marijuana as the predicate felony. K.S.A. 21-5705(a)(4) criminalizes the distribution of controlled substances: 'It shall be unlawful for any person to distribute . . . any of the following controlled substances or controlled substance analogs thereof: [including] any hallucinogenic drug designated in subsection (d) of K.S.A. 65-4105.' And K.S.A. 65-4105(d)(17) lists 'Marijuana' as a hallucinogenic drug. Thus, the State was required to prove that Brown distributed marijuana." 321 Kan. at 8.

Accordingly, we find that distribution of fentanyl is criminalized by K.S.A. 21-5705(a)(1), and by extension that distribution of fentanyl causing death is criminalized by K.S.A. 21-5430(b). Thus, the State charged Farr with a Kansas crime, and the district court had subject matter jurisdiction over the charged offense.

*Was there sufficient evidence to show that Farr aided in the distribution of a controlled substance?*

As an alternative argument, Farr contends that the State failed to prove that the fentanyl distributed in this case was the type of controlled substance criminalized by K.S.A. 21-5705(a)(1).

When a defendant challenges the sufficiency of the evidence in a criminal case, appellate courts view the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The court will not reweigh or resolve evidentiary conflicts or pass on the credibility of witnesses. *Mendez*, 319 Kan. at 723. As above, this court exercises unlimited review over questions of statutory interpretation. *Betts*, 316 Kan. at 197.

17

To convict an individual of a crime, the State must prove to the trier of fact beyond a reasonable doubt of the existence of every element of the offense. *Jackson*, 443 U.S. at 316.

As in the previous section, the crux of Farr's sufficiency argument is that the State failed to prove fentanyl meets any of the precise statutory definitions of "[o]piates, opium or narcotic drugs, or any stimulant designated in subsection (d)(1), (d)(3) or (f)(1) of K.S.A. 65-4107" as criminalized in K.S.A. 21-5705(a)(1).

Two recent cases effectively foreclose Farr's argument. First, in the *Brown* case, discussed above, the Kansas Supreme Court held that because marijuana is a controlled substance, the State need only prove that Brown distributed marijuana, not that the marijuana contained THC. 321 Kan. at 8.

This court recently addressed a similar argument in *State v. Cantu*, 66 Kan. App. 2d 274, 580 P.3d 1270 (2025), *rev. denied* 321 Kan. 791 (2026). In that case, the defendant raised a sufficiency of the evidence claim to challenge his conviction for unlawful possession of methamphetamine. He argued that despite the designation of methamphetamine as a Schedule II controlled substance "'having a potential for abuse associated with a stimulant effect on the central nervous system,'" the State still needed to prove that the methamphetamine he possessed met that same description as an element of the offense. 66 Kan. App. 2d at 277. In line with unpublished decisions from previous panels, this court rejected the defendant's interpretation to hold that the State needed only to prove that the defendant possessed methamphetamine to sustain the conviction. 66 Kan. App. 2d at 278-79. Proving that the substance in the defendant's possession was methamphetamine was enough because "it would be redundant to require the State to prove qualities of methamphetamine that are already incorporated into the statute's definition of the substance." 66 Kan. App. 2d at 279.

18

While *Brown* and *Cantu* involved different crimes and different types of controlled substances, the same rationale applies. As explained in the previous issue, the Legislature designated fentanyl as a Schedule II controlled substance, and particularly categorized it as an opiate, leading to the logical conclusion that the unlawful distribution of fentanyl is prohibited under K.S.A. 21-5705(a)(1). But more importantly, that designation and categorization shows the Legislature has already signified its intent to treat fentanyl as a "substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having addiction-forming or addiction-sustaining liability." K.S.A. 2022 Supp. 21-5701(m). Requiring the State to prove that the fentanyl distributed in this case had the addictive qualities that have already been statutorily defined would be redundant.

In short, the State only needed to prove that fentanyl was distributed in this case in violation of K.S.A. 21-5705(a)(1) to satisfy that element of the charged offense. Because Farr stipulated to that fact, there was sufficient evidence to support that element of the offense.

*The district court did not clearly err by failing to instruct the jury to consider whether fentanyl is a controlled substance.*

Farr also contests his distribution of a controlled substance causing death conviction by challenging the jury instruction, relying on the same underlying argument as the previous two sections. Thus, he contends the elements instruction for the charge was legally infirm because it omitted the precise legal definitions of "'[o]piates, opium or narcotic drugs.'" Farr does not establish that he is entitled to relief on this point.

This court analyzes jury instruction issues using a well-known three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred

19

below; and (3) assessing whether the error requires reversal, that is, whether the error can be considered harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021).

Farr correctly concedes that he did not object to the instruction at issue, which does not preclude appellate review. Rather, this court reviews for clear error at the final step of the jury instruction error analysis. See K.S.A. 22-3414(3); *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023).

Moving to the second step, this court assesses whether error occurred by determining whether an instruction was legally and factually appropriate. Determining whether an instruction was legally appropriate involves an unlimited standard of review of the entire record. *Holley*, 313 Kan. at 254. In determining whether an instruction was factually appropriate, we must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. 313 Kan. at 255.

The district court instructed the jury in Instruction No. 6, as follows:

"The State alleges the Defendant is criminally responsible for a crime committed by another. The defendant is charged with aiding in the commission of Unlawfully Distributing a Controlled Substance resulting in Death.

"To establish this charge, each of the following claims must be proved:
"1. The defendant aided another in the distribution of Fentanyl.
"2. The death of Thomas Jackson Deloach resulted from his use of the Fentanyl distributed by another.
"3. These acts occurred on or about the 11th day of March, 2023 in Pottawatomie County, Kansas.

"It is not a defense that Thomas Jackson Deloach contributed to his own death by using the controlled substance or consenting to the administration of the controlled substance by another.

"'Distribute' means the actual, constructive, or attempted transfer of an item from one person to another, whether or not there is an agency relationship between them. 'Distribute' includes sale, offer for sale, or any act that causes an item to be transferred from one person to another.

"Death 'resulted from' use of Fentanyl if but for its' use death would not have occurred and death was a reasonably foreseeable consequence of the use of Fentenyl [*sic*].

"'Use' means injection, inhalation, ingestion, or other introduction into the body."

Again, Farr's claim of instructional error is based on his argument that the State needed to prove that fentanyl falls under any of the definitions of "[o]piates, opium or narcotic drugs" as required by K.S.A. 21-5705(a)(1), to prove that he committed the related offense of distribution of a controlled substance causing death in violation of K.S.A. 21-5430(b). Accordingly, he contends that it was legally erroneous to omit the definitions of those terms as set forth in K.S.A. 2022 Supp. 21-5701 from Instruction No. 7. But as already explained, fentanyl is designated as a Schedule II controlled substance and is categorized as an opiate under Kansas law. So the State only needed to prove that fentanyl was distributed in violation of K.S.A. 21-5705(a)(1) to establish that element of the charged offense.

The challenged instruction followed the standard pattern instruction, which also does not include specific legal definitions for the terms Farr claims should have been given. The Kansas Supreme Court "'strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions.'" *State v. Zeiner*, 316 Kan. 346, 353, 515 P.3d 736 (2022).

That said, Farr also emphasizes that the district court's instruction omits language stating that the distribution of fentanyl was "'in violation of K.S.A. 21-5705.'" Normally

21

that would be justified because the pattern instruction also recommends instructing the jury that "'[d]istribute' does not include acts of administering, dispensing, or prescribing a controlled substance as authorized by law." PIK Crim. 4th 54.201 (2025 Supp.). Although Farr's instructional error claim is focused on other omissions, the instruction as given was still legally erroneous because it did not require the jury to consider whether Farr aided in the *unlawful* distribution of fentanyl.

Even so, the jury would not likely have returned a different verdict if that particular instructional error had not occurred. See *Holley*, 313 Kan. at 253 (the party claiming clear error must firmly convince the reviewing court that the jury would have reached a different verdict if an erroneous instruction had not been given). There was no evidence presented to suggest that the distribution of fentanyl that occurred here was authorized by law. Farr's only argument to the contrary is that distributing fentanyl is not actually a crime because it is not addressed by name by K.S.A. 21-5705, which was previously discussed and rejected above.

*The prosecutor did not commit reversible error by misstating the law.*

Farr next argues he did not receive a fair trial because of a misstatement of law made by the prosecutor during closing arguments. This argument builds on Farr's first issue, as he contends the prosecutor erroneously told the jury to convict Farr only if it found that he aided Baker in the distribution of fentanyl causing Deloach's death.

Although Farr did not object to the prosecutor's statements in the district court, that does not prevent him from raising a claim of prosecutorial error for the first time on appeal. This court can consider the presence or absence of an objection in its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

Appellate courts review a claim of prosecutorial error using a two-step process, that essentially boils down to determining whether error occurred and then if any error prejudiced the defendant. *Mendez*, 319 Kan. at 737.

The basis for Farr's claim of error is the following statement by the prosecutor:

"The State has to prove two things, that Noah Baker distributed a drug, specifically fentanyl, and that caused the death of Thomas Jackson Deloach, and that his death was a reasonably foreseeable consequence of Baker's action; and *we have to prove that Farr assisted Mr. Baker in committing that crime*." (Emphasis added.)

The analysis for this issue necessarily follows the discussion of Farr's sufficiency argument. Since possession is thus a requirement of proving distribution of a controlled substance under *Crosby*, 312 Kan. at 637, then the State needed to prove Baker transferred possession of the fentanyl to Deloach to establish the offense. Under the reasoning of *Stuart*, 319 Kan. at 636, Deloach took possession of the fentanyl through joint control because Samuelson was acting as Deloach's intermediary in accepting the fentanyl. The prosecutor therefore did not err in stating that the jury should convict if it found that Farr aided Baker in distributing fentanyl.

*The district court erred in not awarding jail credit.*

Finally, Farr argues he was not awarded the jail credit to which he was entitled.

Because Farr raises his claim for the first time on appeal, this court must determine whether to exercise its prudential authority to consider this unpreserved claim. This court may review an unpreserved claim under any of the following limited exceptions: (1) the new claim raises only a question of law based on uncontested facts; (2) consideration is necessary to serve the ends of justice or prevent denial of fundamental rights; or (3) the district court's judgment is correct for the wrong reason.

23

See *State v. Rhoiney*, 314 Kan. 497, 500, 501 P.3d 368 (2021). Yet even if an exception applies, this court retains discretion and may decline review. *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020). Kansas "caselaw is clear that an appellate court has discretion to decide when to walk this path." *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017) (An appellate court has discretion to review an issue raised for the first time on appeal.).

Farr argues we should exercise our prudential authority because his claim raises only a question of law on admitted facts. We agree and will address his newly minted claim.

The right to jail time credit in Kansas is statutory, and under the version that applied at the time Farr committed his offense, a criminal sentence must "reflect . . . an allowance for the time which the defendant *has spent incarcerated pending the disposition of the defendant's cas*e." (Emphasis added.) K.S.A. 21-6615(a); see also *State v. Juiliano*, 315 Kan. 76, 80, 504 P.3d 399 (2022) ("The court sentences a person convicted of a crime in accordance with the sentencing provisions in effect when the person committed the crime.").

In *State v. Hopkins*, 317 Kan. 652, 657, 537 P.3d 845 (2023), the Kansas Supreme Court overturned a prior interpretation of the emphasized language by holding that "[u]nder the obvious and plain meaning of the words chosen by the Legislature, a defendant shall be awarded jail time credit for all time spent in custody pending the disposition of his or her case."

More recently, in *State v. Ervin*, the Kansas Supreme Court reaffirmed that interpretation and applied it to consecutive sentences, holding that "[a] sentencing judge should thus allow credit for all days incarcerated on a case, regardless of whether the

defendant received a credit for some or all that time against a sentence in another case." 320 Kan. 287, Syl. ¶ 12, 566 P.3d 481 (2025).

Although the caselaw, accompanied by a variety of legislative changes, has been changing rapidly over the last couple months and years, we are duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). But, as the State concedes, we are hampered here because of an inadequate record.

A review of the record suggests that there was no final determination of jail credit, so this court cannot determine whether *Hopkins* was properly applied. The sentencing transcript shows the district court initially stated that Farr would receive 302 days of jail credit, but the State believed he was only entitled to 91 days because he had already received 211 of those days in an earlier case. The court then directed the parties to confer to reach an agreement and stated that it would hold a hearing on the matter if no agreement could be reached. The section of the sentencing journal entry for indicating jail credit appears to be blank, which could mean either that Farr received no jail credit or that the parties reached no agreement. There are no hearings or other filings suggesting that a determination of jail credit occurred.

In any event, the proper remedy under *Hopkins* is the same whether Farr received no jail credit or no determination was made. This court must remand with directions to enter an amended journal entry crediting Farr with all days he spent incarcerated pending disposition of this case, regardless of whether he also received credit in an earlier case.

Conviction affirmed, sentence vacated, and case remanded with directions.

25